[Cite as *State v. Bellum*, 2025-Ohio-5336.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DEVON J. BELLUM,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 JE 0007**

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 21 CR 198

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jane M. Hanlin*, Jefferson County Prosecutor, and *Atty. Frank J. Bruzzese,* Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Kiran Kovoor Mikhaiel*, Mikhaiel Law, LLC, for Defendant-Appellant.


Dated:  November 26, 2025

**HANNI, J.**

{¶1}    Defendant-Appellant, Devon J. Bellum, appeals from a Jefferson County Common Pleas Court judgment denying his motion for a new trial.  Appellant was convicted of having weapons while under disability, carrying a concealed weapon, tampering with evidence, aggravated menacing, and possession of heroin, following a jury trial.  He moved for a new trial on the basis that he was denied a public trial when the courthouse doors were locked at 4:30 p.m. for the day.  Closing arguments and the reading of the jury instructions occurred after that time.  Because the trial court did not violate Appellant's right to a public trial, the trial court's judgment is affirmed.

{¶2}    The underlying facts of this case are not at issue in this appeal.  In sum, the incident leading to Appellant's arrest and conviction stemmed from a bar fight on October 23, 2021, at the Hillsboro Grill and Tavern located in Mingo Junction, Jefferson County.  Appellant was alleged to have brandished a gun during a fight with other bar patrons.  He then left the bar and drove to a friend's house where he allegedly hid the gun on his friend's porch.  After his arrest, police located heroin on Appellant's person.

{¶3}    On December 1, 2021, a Jefferson County Grand Jury indicted Appellant on three counts of having weapons while under disability, third-degree felonies in violation of R.C. 2923.13(A)(3)(B); carrying a concealed weapon, a fourth-degree felony in violation of R.C. 2923.12(A)(2)(F)(1); tampering with evidence, a third-degree felony in violation of R.C. 2921.12(A)(1)(B); aggravated menacing, a first-degree misdemeanor in violation of R.C. 2903.21(A)(B); and possession of heroin, a fifth-degree felony in violation of R.C. 2925.11(A)(C)(6)(a).  Appellant pleaded not guilty.

{¶4}    The matter proceeded to a jury trial at 9:00 a.m. on Thursday, January 19, 2023.  Although Appellant was charged with three counts of weapons under disability, only count one was presented to the jury as a result of a stipulation by the parties.  Appellant's family was present.  Appellant's trial continued until 6:30 p.m. on the first day.  Appellant's family remained in the courtroom until the conclusion of trial on Thursday (the first day).

{¶5}    Trial resumed the morning of Friday, January 20, 2023.  Members of Appellant's family were again present.  At approximately 3:45 p.m., Appellant's trial went

into recess at the conclusion of Appellant's case and before closing arguments. At that time, the family members remaining were Appellant's sister Shawna Bellum, Appellant's brother Cody Bellum, and Appellant's other brother's fiancé Amy Pahl. During the recess, Shawna and Amy left to take Cody, who is wheelchair-bound, to the nursing facility where he resides. When they returned at approximately 4:45 p.m., the courthouse doors were locked. Appellant did not object to the locking of the courthouse. Closing arguments began at approximately 4:55 p.m. and concluded just before 6:00 p.m. The court then gave the jury instructions. The jurors deliberated that evening and returned a guilty verdict as to all charges at approximately 9:30 p.m.

{¶6} The trial court then proceeded to sentencing. It sentenced Appellant to 36 months for having weapons while under disability, 18 months for carrying a concealed weapon, 30 months for tampering with evidence, 180 days for aggravated menacing, and 12 months for possession of heroin. It ordered Appellant to serve the first three sentences consecutively to each other and the last two sentences concurrently with the other sentences for an aggregate sentence of 7 years.

{¶7} Appellant filed a motion for a new trial on February 2, 2023. He asserted he was denied his constitutional right to a public trial when the courthouse doors were locked at 4:30 p.m. on both Thursday and Friday. The State filed a motion in opposition and the trial court set the matter for a hearing.

{¶8} Appellant next filed a notice of appeal on February 8, 2023.

{¶9} Despite the fact that an appeal was now pending with this Court, the trial court held a hearing on Appellant's motion for new trial on March 6, 2023. The trial court issued a judgment denying Appellant's motion on August 4, 2023.

{¶10} On May 28, 2024, this Court issued our opinion in Appellant's direct appeal. *State v. Bellum*, 2024-Ohio-2742 (7th Dist.). Before addressing the merits of Appellant's assignments of error, we addressed the fact that the trial court had held a hearing and ruled on Appellant's motion for a new trial while this appeal was pending. We found: "Because we had already assumed jurisdiction over this matter and the issue before the trial court clearly would have affected our review, the trial court was without jurisdiction to rule on the motion for a new trial." *Id*. at ¶ 30. Thus, we struck the trial court's judgment

overruling the motion for a new trial. We then went on to address the merits of the appeal and affirmed Appellant's conviction.

{¶11} On September 16, 2024, Appellant re-filed his motion for a new trial. The trial court held a hearing on Appellant's motion on November 1, 2024. The court heard testimony and arguments. It then ordered the transcripts from both this hearing and the previous hearing for its review.

{¶12} On May 2, 2025, the trial court issued its judgment overruling Appellant's motion for a new trial. The court made the following findings.

{¶13} As to the first day of trial, Appellant's family members had no difficulties in attending the trial after 4:30 p.m. They were able to get in and out of the courthouse and the courtroom during and after breaks and were present during all proceedings on day one. Thus, the court found there was no issue with day one of the trial.

{¶14} As to the second day of trial, the defense rested at 3:45 p.m., which is prior to the "approximate and usual" closing time of the courthouse at 4:30 p.m. Some discrepancies exist regarding the exact time the courthouse closed on day two. The two deputies' testimonies were not clear on the exact time the courthouse was locked. And there were conflicts as to which deputy assisted Appellant's brother out of the handicap accessible exit to the courthouse. During trial, there was no "closure order" by the court nor was any particular person prohibited from attending the trial. When Appellant's family returned to the courthouse, they could not get back in. They were concerned that the jury would view their absence in a negative light towards Appellant. The court found there was no reason the jury would automatically construe their absence against Appellant. It further found no infringement on Appellant's right to a public trial. It stated that a right to a public trial is not absolute and control of the courtroom and safety of the courthouse are subject to the trial court's discretion. It stated that while the trial court has the discretion to control the courtroom, at no time did the court order the courthouse or the courtroom closed.

{¶15} Thus, the trial court denied Appellant's motion for a new trial.

{¶16} Appellant filed a timely notice of appeal on June 2, 2025. He now raises a single assignment of error that states:

THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL. THE MOTION WAS PREDICATED ON THE DEFENDANT'S CONSTITUTIONAL RIGHT TO A PUBLIC TRIAL AS GUARANTEED BY THE SIXTH AMENDMENT, WHICH IS APPLICABLE TO THE STATES THROUGH THE FOURTEENTH AMENDMENT.

**{¶17}** Appellant argues he was denied his constitutional right to a public trial when the courthouse was locked at 4:30 p.m. on day two of trial yet his trial continued well past that time. Appellant did not object to the locking of the courthouse at 4:30 p.m.

**{¶18}** Appellant states his family was there to support him throughout his trial and were seated directly behind him in the courtroom. He claims the fact that they were unable to return for closing arguments and the jury instructions denied him of his right to a public trial. Appellant argues that their absence during closing arguments and jury instructions was notably apparent.

**{¶19}** Appellant agrees that entry may be denied to a courtroom to those who pose a threat or are likely to disrupt a trial. However, he argues it is impermissible to lock the doors after hours out of convenience or judicial practice if a trial is still proceeding. Even absent an objection, Appellant asserts this constitutes reversible error.

**{¶20}** A criminal defendant is guaranteed the fundamental right to a public trial under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

**{¶21}** But "[t]he right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice. A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings." *State v. Drummond*, 2006-Ohio-5084, ¶ 51. However, the infringement on a defendant's right to a public trial may only occur when necessary, "and any closure must be narrowly drawn and applied sparingly." *Id*., citing *State ex rel. The Repository, Div. of Thompson Newspapers, Inc. v. Unger*, 28 Ohio St.3d 418, 421 (1986); *State v. Lane*, 60 Ohio St.2d 112, 121 (1979); *State v. Clifford*, 135 Ohio App.3d 207, 213 (1st Dist. 1999).

**{¶22}** In support of his argument, Appellant relies on *State v. Bond*, 2022-Ohio-4150. In *Bond*, an altercation occurred outside of the courtroom during a recess between

several people attending the trial. Consequently, the trial court only allowed immediate family members into the courtroom from that point forward. Bond was convicted of murder with a firearm specification. He appealed arguing in part that the trial court violated his right to a public trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when it closed the trial to the public. The Fifth District found that Bond's failure to object to the courtroom closure did not result in a waiver of his right to a public trial, because a violation of that right is considered structural error that could not be waived. *Id*. at ¶ 5. It further found that the trial court failed to provide sufficient justification for the partial closure of the courtroom, which constituted structural error. *Id*. The appellate court, therefore, reversed and remanded for a new trial. The State appealed.

**{¶23}** On appeal, the Ohio Supreme Court undertook an in-depth analysis of the plain error standard of review when a structural error is involved.

**{¶24}** The state argued that the court of appeals should have conducted a plain-error analysis because Bond did not object to the courtroom closure at trial. *Id*. at ¶ 14. Bond argued that a plain-error analysis was not appropriate for a violation of a constitutional right resulting in a structural error and that even if the appellate court reviewed the public-trial violation for plain error, the prejudice or harm to him should be presumed because the error was structural. *Id*.

**{¶25}** The Court explained that plain errors that affect substantial rights may be noticed even though they were not brought to the attention of the trial court. *Id*. at ¶ 7, citing Crim.R. 52(B). A plain-error review requires the defendant to bear the burden to demonstrate the requirements for review. *Id.*, citing *State v. Jones*, 2020-Ohio-3051, ¶ 17-18.

**{¶26}** The Court then recognized that a public-trial violation is a structural error. *Id*. at ¶ 16, citing *State v. Drummond*, 2006-Ohio-5084, ¶ 50.

**{¶27}** The Court first agreed with the court of appeals that under the *Waller* test, a public-trial violation occurred in this case. *Id.* at ¶ 15. It then pointed out that in considering whether a courtroom closure has violated a defendant's right to a public trial, courts are to apply a four-factor test as set out in *Waller v. Georgia*, 467 U.S. 39, 48, (1984):

Case No. 25 JE 0007

The following four factors must be satisfied for a permissible courtroom closure: (1) the party seeking to close a public hearing must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) the trial court must make findings adequate to support the closure. When a courtroom closure is partial, rather than total, the first factor of the *Waller* test is satisfied if there is a "substantial reason" for the closure. *Drummond* at ¶ 53.

*Id*. at ¶ 12.

{¶28} The *Bond* Court found that the appellate court failed to consider the *Waller* factors. The Court then went on to discuss the alleged error in light of the fact that Bond did not object to the partial closure of the courtroom. The Court stated:

[I]n *Waller*, the United States Supreme Court held that "under the Sixth Amendment any closure of a suppression hearing [like the closure of any proceeding in a criminal trial] *over the objections of the accused* must meet" the four-factor test. (Emphasis added.) *Waller* at 46-47, 104 S. Ct. 2210. Thus, neither *Waller* nor this court's precedent recognizing that a public-trial violation is structural error answer the question whether a public-trial violation is a *correctible* error when the defendant did not object to the closure at trial. To answer that question, we apply a plain-error analysis.

*Id*. at ¶ 16; (emphasis sic.). So the Court determined that *Waller* is only to be applied when the defendant objects to the courtroom closure.

{¶29} Next, the Court observed that "[w]hen a recognized structural error has occurred, that error is certainly plain." *Id*. at ¶ 19. It stated that "[t]he closer question is whether the error affected substantial rights, and that question must be answered in the affirmative before the error may be corrected under Crim.R. 52(B)." *Id.* The Court then concluded:

[A] structural error may affect substantial rights even if the defendant cannot show that the outcome of the trial would have been different had the error not occurred. To conclude otherwise would be to ignore the long-standing structural-error doctrine, the purpose of which "is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial," *Weaver* at 295, 137 S.Ct. at 1907.

*Id.* at ¶ 32, quoting *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017).

**{¶30}** The Court then reiterated that in order to honor the nature of a structural error within the plain-error analysis, courts are to recognize that a defendant may show a structural error to which he has failed to object at trial may have affected substantial rights for the purposes of a plain-error analysis, even if that defendant cannot show that but for the error, the outcome of the trial would have been different. *Id.* at ¶ 33. The Court clarified, however, that it would not presume prejudice in such cases. *Id.* at ¶ 34. Instead, it noted that it was leaving room in a plain-error review "to recognize the unique nature and fundamental import of established structural errors." *Id.* Finally, the Court stated that on review a court would still have to consider "whether correcting the error is required to prevent a manifest miscarriage of justice or whether the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at ¶ 35, citing *United States v. Olano*, 507 U.S. 725, 736 (1993).

**{¶31}** The Court went on point out that:

"[T]he [United States Supreme] Court has not said that a public-trial violation renders a trial fundamentally unfair in every case." *Weaver*, 582 U.S. at 298, 137 S.Ct. 1899, 198 L.Ed.2d 420. As the *Weaver* court pointed out, "while the public-trial right is important for fundamental reasons, in some cases an *unlawful* closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." (Emphasis added.) *Id.* at 299. If a trial was fundamentally fair *in spite* of a public-trial violation, it would be odd to conclude that the error must be corrected when no objection was made.

*Id.* at ¶ 36; (Emphasis sic.).

**{¶32}** The Court then went on to apply the law to facts before it. It pointed out the following. The courtroom closure occurred during the state's presentation of evidence. *Id.* at ¶ 37. The court permitted Bond's immediate family members and the victim's immediate family members to attend the rest of the trial. *Id.* Thus, the closure was only considered partial. *Id.* Bond did not assert that any specific people attempted to enter the courtroom and were denied access, nor did he assert any harm that resulted from the closure. *Id.* There was no indication that the jurors were aware of the decision to limit courtroom access. *Id.*

**{¶33}** While noting that these factors might weigh differently in the context of a *Waller* analysis or if Bond had lodged an objection to the closure in the trial court, the Court determined that, in the context of a plain-error analysis, the public-trial violation did not rise to the level of a plain error that must be corrected. *Id.* at ¶ 37. It found that Bond did not meet his burden to show, within the plain-error framework, that the public-trial violation so affected the fairness of the proceeding as to require correction. *Id.*

**{¶34}** Thus, we must consider the locking of the courthouse doors in this case in light of the plain-error analysis as explained in *Bond*.

**{¶35}** The State contends the trial court's "inadvertent" closure did not violate Appellant's right to a fair trial. The State is correct insofar as the trial court did not order a closure of its courtroom. Instead, the courthouse itself was locked as a matter of security policy. And importantly the trial court noted that the media remained in the courtroom for the duration of the trial.

**{¶36}** The witnesses' testimony support the finding that the trial court did not order a "closure" of the courtroom.

**{¶37}** Two deputies were present during Appellant's trial. Deputy Mahmoud Hassan testified that the courthouse closes for business daily at 4:30 p.m. (Tr. 60). He stated that sometimes there are still trials going on at that time. (Tr. 60). If that is the case, the deputy will inquire with those in attendance if they wish to stay or leave and accommodate those people. (Tr. 61). Deputy Hassan will still lock the courthouse doors and wait to escort anyone out who leaves after hours. (Tr. 60-61).

**{¶38}** On the day in question, Deputy Hassan stated that he escorted Appellant's family out of the courthouse so that he could help with Appellant's brother who was

wheelchair-bound. (Tr. 62-63). He stated he asked if they would be returning and at least one family member told him they would not be returning and that Appellant would call with the results. (Tr. 63-64). However, the deputy could not recall if more than one person said this. (Tr. 64).

{¶39} A bit later, while Deputy Hassan was back in the courtroom, he overheard defense counsel's secretary say that someone was trying to get into the courthouse. (Tr. 69-70). Consequently, he went and checked both the front doors and the side doors and waited approximately ten minutes. (Tr. 70). But no one came to the doors. (Tr. 70-71).

{¶40} Deputy Christopher Horner also testified that it is policy to lock the courthouse doors for security purposes daily at 4:30 p.m. (Tr. 146). He stated that defense counsel's secretary told him Appellant's family was on their way back, so at approximately 4:45 p.m. he went and checked the doors but did not see anyone. (Tr. 147-148). He also exited the courthouse, checked the sidewalk, and looked around before going back inside. (Tr. 150).

{¶41} Fern Landesberg-Myers is a paralegal who works for Appellant's counsel. She was present at the trial. Landesberg-Myers testified that at the break prior to closing arguments, "everybody" knew that Amy (Appellant's brother's fiancé) and Shawna (Appellant's sister) were leaving to take Cody (Appellant's brother) back to his nursing home. (Tr. 93). Landesberg-Myers instructed them to inform the deputy that they would be returning so that they could make arrangements to get back into the courthouse. (Tr. 94). She stated that sometime after 4:30 p.m., she received a phone call from Amy stating she and Shawna were outside the courthouse and trying to get back in. (Tr. 95). Landesberg-Myers informed them that the courthouse was locked at 4:30 p.m. (Tr. 95).

{¶42} Amy testified that she left with Shawna to take Cody to the nursing home at 4:00 p.m. when the court took a 45-minute recess. (Tr. 102). Amy stated that when she and Shawna returned, the courthouse doors were locked. (Tr. 103-104). She stated they contacted Landesberg-Myers who told them it was after 4:30 p.m. and they would not be allowed back in. (Tr. 104-105).

{¶43} Shawna testified that at 4:00 p.m., a deputy escorted her, Amy, and Cody out so that Cody could use the handicap door. (Tr. 125-126). She mentioned to the deputy that they would be back after dropping off Cody. (Tr. 126-127). When they

returned, the courthouse doors were locked. (Tr. 130-131). Shawna stated that in the meantime, Landesberg-Myers had left them a message that they were too late. (Tr. 131). Shawna stated that the only person who told them they were not permitted back in the courthouse was Landesberg-Myers. (Tr. 136).

**{¶44}** The State further asserts Appellant is merely speculating as to what, if anything, the jury noticed regarding his family members' absence. Appellant guesses that the jury may have thought his family perceived his guilt and left. But this is simply conjecture on Appellant's part. No juror was interviewed after the trial. The jury could have just as easily believed that Appellant's family had left because the presentation of evidence had come to an end. It is also possible the jury did not notice their absence. We will not guess at what the jury may or may not have thought absent any evidence.

**{¶45}** The State also argues Appellant's failure to object to the closure constitutes waiver. As discussed in detail above, pursuant to *Bond*, 2022-Ohio-4150, because Appellant failed to object we are to review this matter for plain error.

**{¶46}** The State next asserts that a *partial* closure is not a denial of a public trial. Significantly, it points out that the press was present for the entire trial.

**{¶47}** Although not on the same facts, because in that case there was a defense objection, the Ohio Supreme Court has delineated a difference between total courtroom closures and partial courtroom closures. *State v. Drummond*, 2006-Ohio-5084. The Court found the partial closure significant in *Drummond* at ¶ 53: "This case differs, as it deals with partial closure of a trial. The trial court excluded members of the public and the defendant's family, but did so only for the length of a single cross-examination and two other witnesses' testimony. The trial court permitted media representatives to remain in the courtroom throughout the testimony of these witnesses."

**{¶48}** And in a First District case, the appellate court found the routine closure of the courthouse after regular business hours was not a violation of Deters' right to a public trial:

> In this case, the closure was minimal. As a preliminary matter, the closure was inadvertent rather than deliberate.
>
> The trial court originally scheduled the contempt hearing for 3:00 p.m. Due to a Durrani jury trial in progress, however, the hearing

commenced at "approximately" 4:00 p.m. As part of their routine security measures, court security locked the courthouse entrance at 4:00 p.m. Nonetheless, the doors to the courtroom remained open, and any spectators in the building prior to 4:00 p.m. could attend the hearing in its entirety. Indeed, several members of the press and other interested spectators were in attendance.

*In re Deters*, 2020-Ohio-3518, ¶ 24 (1st Dist.).

**{¶49}** Likewise, in this case, the courtroom remained open and any spectators who were in the building prior to 4:30 p.m. could have attended the remainder of the trial. Significantly, the media was present throughout the entire trial. The trial court found: "The Press was present during both days at all stages of the proceedings." (5/2/25 Judgment Entry). Thus, there was not a total closure of the courthouse here and the courtroom itself remained open.

**{¶50}** The better practice in a case such as this would be to station a deputy by the door after the courthouse was locked for the day, if possible and feasible. That way, should a member of the public wish to enter, the deputy would be on hand to let them in. But Appellant's family members were aware of what time the courthouse closed and when they should return. And upon alert that the family members might have been outside the courthouse, deputies searched two entrances, the outside of the court, and the sidewalk but found no one.

**{¶51}** Because there was no objection in this case, we are left with determining whether Appellant showed, within the plain-error framework, that the public-trial violation so affected the fairness of the proceeding as to require correction. *See Bond*, 2022-Ohio-4150, at ¶ 37. Based on all of the above, Appellant did not meet this burden.

**{¶52}** Accordingly, Appellant's sole assignment of error is without merit and is overruled.

**{¶53}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Dickey, J., concurs.

Case No. 25 JE 0007

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**